UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

VANESSA A. LOCKWOOD,

                    Plaintiff,

                                                    **REPORT AND**
                                                    **RECOMMENDATION**

          v.
                                                    12-CV-0973-A

CAROLYN W. COLVIN,[1]
COMMISSIONER OF SOCIAL SECURITY,

                    Defendant.

## I.    INTRODUCTION

        The Hon. Richard J. Arcara referred this case to this Court under 28 U.S.C. § 636(b).

Pending before the Court are cross-motions for judgment on the pleadings by plaintiff Vanessa

A. Lockwood ("Lockwood") (Dkt. No. 10) and the Commissioner of Social Security

("Commissioner") (Dkt. No. 9).

        The Commissioner already found Lockwood disabled as of August 1, 2007 under the

Social Security Act ("the Act") and has rewarded benefits accordingly. Lockwood now argues

that the Commissioner erred in not pushing her onset date to August 20, 2003. Lockwood argues

for the earlier date in several ways. Lockwood argues that the Commissioner failed to properly

evaluate and weigh the medical opinion of her treating physician, Dr. Barbra Majeroni, using the

six factors as required under 20 C.F.R. § 416.927(d). Lockwood also argues that the

Commissioner did not comply with the requirements of SSR 83-20 in determining the onset date

---

[1] Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, the Clerk of the Court is directed to substitute
Carolyn W. Colvin for Michael J. Astrue as Commissioner of Social Security.

of Plaintiff's disability. The Commissioner, according to Lockwood, failed to consider or evaluate the statements of her family members under SSR 06-03 and SSR 96-7P. Finally, Lockwood argues that the Commissioner violated SSR 82-59 and improperly found that she refused reasonable care which would have corrected her medical problem.

The Commissioner responds that substantial evidence supports an onset date of August 1, 2007. According to the Commissioner, Lockwood was not disabled prior to August 1, 2007, and Dr. Majeroni's medical opinion was not fully supported by the record. Dr. Majeroni's opinion was based on subjective complaints rather than objective medical evidence; testimony from non-medical sources did not demonstrate that Lockwood's symptoms prevented her from participating in substantial gainful activity prior to August 1, 2007. Finally, the Commissioner asserts that the Administrative Law Judge ("ALJ") explored Lockwood's reasons for her refusal of treatment, and found them unsupported by evidence in the record.

The Court has deemed the motion submitted on papers under Rule 78(b) of the Federal Rules of Civil Procedure. For the reasons below, the Court respectfully recommends granting the Commissioner's motion. The Court further recommends denying Lockwood's cross-motion.

## II.   BACKGROUND

### A. *Procedural History*

On December 21, 2004, Lockwood filed a second[2] claim for Supplemental Security Income ("SSI") under the Act, claiming a disability beginning on September 1, 1991. (Certified

---

[2] December 21, 2004 was the date of Lockwood's second claim for disability under the Act. Her first claim, filed on August 20, 2003, was denied, and Lockwood did not file a hearing request. [90, 108-10.] While the second claim ran its course as described above, Lockwood filed a third claim on March 1, 2008. [47.] The third claim resulted in a favorable decision dated October 6, 2008, that Lockwood was disabled as of March 1, 2008. *Id.* The Appeals Council reopened the third claim when it remanded the second claim, because it felt the evidence did not support a finding of such a diminished capacity. *Id.* The record contains no other information about this third claim. The Court assumes that this claim was consolidated with the claim in issue. Either way, the Court notes the existence of a third claim for the sake of the record and finds that it has no impact on the substantive issues that the parties have raised.

Administrative Record at 17, 107-10, hereinafter designated as [17, 107-10].) The Commissioner denied Lockwood's initial claim, after which Lockwood requested a hearing. [68, 96-102.] On March 21, 2007, Lockwood amended her alleged onset date to August 20, 2003. [77.] Lockwood's hearing was held on May 18, 2007, before ALJ Timothy M. McGuan. [405-27.] On July 3, 2007, the ALJ denied Lockwood's claim. [65-76.] Lockwood filed a request for the Appeals Council to review the ALJ's decision. [65.] On March 25, 2009, the Appeals Council approved Lockwood's request to review the ALJ's decision. [51-55.] The decision was reviewed on May 1, 2009. [46.] Upon remand, the ALJ held a second hearing on October 15, 2009. [428-49.] Following the hearing, the ALJ issued a partially favorable decision on October 27, 2009, finding Lockwood disabled as of August 1, 2007, but not disabled before then. [17-26.] Lockwood filed a complaint on October 15, 2012, and this case followed (Dkt. No. 1).

## B. *Factual and Medical Background*

Vanessa Lockwood was born on August 15, 1953. Lockwood has completed high school and two years of college (Dkt. No. 1 at 2). Lockwood has suffered from a number of ailments, including multiple uterine fibroids and Paranoid Schizophrenia. [236, 333.] Lockwood has also been diagnosed with depression and anxiety and has reported problems sleeping. [261, 333.] Lockwood suffered from symptoms such as swelling of the uterus, uterine bleeding, and abdominal pain caused by her uterine fibroids. *Id.* She had been treated with Depo-Provera injections every three months to control the pain and bleeding. *Id.*

Lockwood had no past relevant work (Dkt. No. 1 at 2). Lockwood alleged she had to stop working in 2003 because of her fibroid condition, but her earning records are somewhat inconsistent on this point. According to her earning records, Lockwood earned $7.73 that year and the years before that indicate no earnings at all. [114, 178]; Dkt. No. 10. Lockwood worked

for three months in 2007 as a part-time employee at Goodwill, but her employment ended in August 2007. [360, 436.]

### 1.   Medical evidence between August 20, 2003 and August 1, 2007.

On September 16, 2003, a State Agency Disability Analyst reviewed Lockwood's record and opined that Lockwood had no postural, manipulative, visual, communicative, or environmental limitations. [214.] On January 3, 2005, about two years after Lockwood filed for SSI, Lockwood had her initial consultation with Dr. Majeroni, who performed a disability assessment and opined that Lockwood could only perform sedentary work. [225, 234, 321.]  Dr. Majeroni's opinion was based on Lockwood's complaints of pain when standing for long periods of time. *Id.*

On February 18, 2005, just over one month after Lockwood's consultation with Dr. Majeroni, the consultative physician, Dr. Mohammad Jaffri, examined Lockwood at the request of the State Agency for her SSI application. [236-40.] Dr. Jaffri noted Lockwood's complaints of pain in her lower abdomen while squatting, and that she had restricted range of motion in her lumbar spine. [238.] Dr. Jaffri performed an x-ray of Lockwood's lumbar spine and determined she had a large pelvic mass, a slight narrowing of disk space and mild scoliosis. [288.] Dr. Jaffri opined that Lockwood had moderate limitations with lifting and carrying heavy objects and strenuous activities, and mild to moderate limitations with long walks. Lockwood was not required to undergo a psychiatric exam because her claims were of physical impairments. [240.]

On March 3, 2005, Lockwood complained that the Depo-Provera shots had not been effective and had inquired about a hysterectomy. [243.] On April 28, 2005, Lockwood went to Erie County Medical Center ("ECMC") to discuss surgery, but after one half-hour of waiting,

became frustrated and "stormed out." [308.] As a result of this outburst, the attending doctor wrote, "I will not see this patient again & will not do surgery for her!" [308.] On her way out, Lockwood indicated that she did not want the surgery anymore, but also said that she would go somewhere else for the procedure. [308.] At the hearing on May 18, 2007, Lockwood claimed the doctor did not clear her for surgery. [413-14, 433.]

On October 20, 2005, Lockwood had no complaints of pain and was asymptomatic. [304.] On January 5, 2006, Lockwood complained again of bleeding and was still considering surgery; she continued with the Depo-Provera shots and painkillers for treatment. [294-300, 302.] In 2006, Lockwood began showing signs of menopause and in response, her doctors began to taper her Depo-Provera shots. [419.] During her visit with Dr. Majeroni on January 23, 2007, Lockwood stated she was doing fine, and noted her mood was better and her affect was bright. [351.]

On February 9, 2007, Dr. Majeroni completed a Residual Functional Capacity ("RFC") assessment and opined that Lockwood could lift ten pounds frequently, stand or walk for less than two hours during an eight hour workday, and had no limitations in sitting, pushing and/or pulling. [309-17.] At this point, Dr. Majeroni had seen Lockwood monthly for the past two years. [310.] It was during this assessment that Lockwood was diagnosed with depression and anxiety, which was controlled, shortly thereafter, with medication. [313, 420.]  Dr. Majeroni had noted that Lockwood's mental impairments were "not disabling." [310, 313.]

On April 2, 2007, Dr. Majeroni completed another RFC assessment where she opined that Lockwood could perform sedentary work. [312.] Dr. Majeroni opined that Lockwood's

limitations onset occurred no later than January 2005, which was her first examination of Lockwood. *Id.* On May 29, 2007, Dr. Majeroni stated that Lockwood was "doing OK." [343.]

### 2. Medical evidence subsequent to August 1, 2007.

On August 6, 2007, Lockwood visited the emergency room to obtain psychiatric medications that she claims to have been stolen. [358.] The emergency room staff observed Lockwood's behavior and determined she was suffering from delusions. [358.] During the visit, Lockwood was making incoherent statements about being sexually propositioned by her boss, being offered to sleep with three men for $20,000, and being poisoned. Lockwood also made statements concerning a girl's uterus being torn from her body and about having an unspecified connection with the people who killed John F. Kennedy and Martin Luther King, Jr. [358.] On September 13, 2007, a psychiatric evaluation revealed Lockwood suffered from Paranoid Schizophrenia and Schizo-Affective Disorder. [378-80.] Her GAF score was assessed at 50, which indicated serious symptoms.[3] [379.]

Lockwood's Paranoid Schizophrenia has caused audio and visual hallucinations of imaginary beings she refers to as "hybrids."[4] [402.] Lockwood claimed she had been suffering from hallucinations since childhood. [367.] On August 1, 2007, an interaction with the "hybrids" caused Lockwood to ultimately lose her job at Goodwill. [401-03, 436, 438.] On July 9, 2008, Lockwood's treating psychiatrist, Dr. Seung Kyoon Park, opined Lockwood was unable to work due to her mental conditions. [403.]

---

[3] Global Assessment of Functioning ("GAF") considers psychological, social and occupational functioning on a hypothetical continuum of mental health-illness. This assessment does not include impairments in functioning due to physical limitations. A score of 50 indicates serious symptoms. [379]; *The American Psychiatric Association Diagnostic & Statistical Manual of Mental Disorders* (4th ed., rev. 2002), *available at* LEXIS (section titled "Multiaxial Assessment").

[4] A "hybrid" is described in the record as a supernatural being that flies and is round with tentacles. These "hybrids" live in Lockwood's home and follow her wherever she goes. [21, 402, 436.]

On April 15, 2009, Lockwood's treating counselor, Mr. Michael Parker, completed a mental RFC in which he opined Lockwood had marked limitations in maintaining social functioning; marked limitations in concentration, persistence, or pace; and moderate limitations in daily living activities. [392-95.] Mr. Parker diagnosed Lockwood with Delusional Disorder and assessed a GAF of 50. [392.] Mr. Parker also opined that Lockwood had a current history of an inability to function outside a highly supportive living arrangement for at least one year. [395.] However, during the October 15, 2009 hearing, Lockwood stated that she lives alone and performs daily activities including laundry, housework, preparing dinner, cleaning and writing. [165.] Lockwood regularly shopped for clothing and food, and wrote novels in her spare time. [168.]

In the decision issued October 27, 2009, the ALJ found the severe impairment of multiple uterine fibroids since the alleged onset date of September 1, 1991. [20.] The ALJ found that this impairment by itself was not disabling. *Id.* The ALJ also determined that prior to August 1, 2007, Lockwood had the RFC to perform no more than light work pursuant to 20 C.F.R. § 426.967(b), with the condition that she must alternate between sitting and standing after thirty minutes, and could do occasional squatting and stooping. [21.] The Vocational Expert ("VE") determined Lockwood could carry out the job duties of a cashier or a ticket seller. [25.] The ALJ found that as of August 1, 2007, the established onset date of disability, Lockwood was suffering from the severe impairments of multiple uterine fibroids and Paranoid Schizophrenia. [21.] As of August 1, 2007, Lockwood's mental impairment met the criteria of Listing 12.03 and was found to be disabled at step 3. [25]; 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.03.

## III.   STANDARD OF REVIEW GENERALLY

The only issue to be determined by this Court is whether the ALJ's decision that Lockwood was not disabled before August 1, 2007, is supported by substantial evidence. *See* 42 U.S.C. § 405(g); *Rivera v. Sullivan*, 923 F.2d 964, 967 (2d Cir. 1991). Substantial evidence is defined as "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).

For the purposes of determining SSI benefits, a person is disabled if she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).

An individual will only be found to have such a disability if her "physical or mental impairment or impairments are of such severity that [he or she] is not only unable to do [his or her] previous work but cannot, considering [his or her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy…." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

The initial burden of showing that her impairment prevents her from returning to her previous type of employment falls on the plaintiff. *Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir.1982). Once this burden has been met, "the burden shifts to the [Commissioner] to prove the existence of alternative substantial gainful work which exists in the national economy and which the claimant could perform." *Id.*; *see also Dumas v. Schweiker*, 712 F.2d 1545, 1551 (2d Cir.1983); *Parker v. Harris*, 626 F.2d 225, 231 (2d Cir.1980).

To determine whether a plaintiff is disabled, an ALJ must employ a five-step inquiry:

1. Whether the plaintiff is currently working;

2. Whether the plaintiff suffers from a severe impairment;

3. Whether the impairment is listed in Appendix 1 of the relevant regulations;

4. Whether the impairment prevents the plaintiff from continuing her past relevant work; and

5. Whether the impairment prevents the plaintiff from doing any kind of work.

20 C.F.R. §§ 404.1520, 416.920; *Berry, supra*, 675 F.2d at 467.

If the claimant's impairment is not listed in Appendix 1, the ALJ must determine whether she has the RFC to work. *Rivera v. Apfel*, 2000 U.S. Dist. LEXIS 12108 *11 (S.D.N.Y. Aug. 21. 2000). If a plaintiff is either found to be disabled at any step in this five-step inquiry, or not disabled after all five, the ALJ's review ends. 20 C.F.R. §§ 404.1520(a), 416.920(a); *Musgrave v. Sullivan*, 966 F.2d 1371, 1374 (10th Cir.1992).

To determine whether an admitted impairment prevents a plaintiff from performing her past work, the ALJ is required to review the plaintiff's RFC and the physical and mental requirements of the work she has done in the past. 20 C.F.R. §§ 404.1520(e), 416.920(e). If a claimant has no past relevant work, the burden falls to the Commissioner who "must introduce affirmative medical evidence which proves that the claimant can perform some type of work." *Rivera*, 2000 U.S. Dist. Lexis 12108 *11 (*citing* 20 C.F.R. § 404.1567).

## IV.   DISCUSSION

Under the Act, SSI benefits are not available to an individual who is able to work. 42 U.S.C. § 1382c(a)(3)(A). The claimant must demonstrate she is disabled. *Id.* To determine disability the ALJ must go through the five-step inquiry. 20 C.F.R. §§ 404.1520, 416.920. The

first step of the five-step inquiry for this case does not require much discussion. Lockwood was not engaged in substantial gainful activity from the alleged onset date, August 20, 2003. [20.] At step two, the ALJ found that since August 20, 2003, Lockwood had a severe impairment of multiple uterine fibroids and as of August 1, 2007, Lockwood had severe impairments of multiple uterine fibroids combined with Paranoid Schizophrenia. *Id.*

At step three, the ALJ determined that Lockwood's impairments prior to August 1, 2007, did not meet a listed impairment in Appendix 1 of the relevant regulations. *Id.*; *see* 20 C.F.R. Pt. 404, Subpt. P., Appx. 1. The ALJ determined that prior to August 1, 2007, Lockwood could perform light work with conditions of changing between sitting and standing after thirty minutes with occasional squatting and stooping. *See id.* [21.]

Because of Lockwood's lack of past relevant work, the ALJ skipped step four, and proceeded to step five. 20 C.F.R. §§ 404.1520, 416.920. At step five, the burden shifts to the ALJ to consider Lockwood's RFC, age, education, work experience and the testimony of the VE. *Id.* The VE testified that there is work which exists in the national economy that someone compared to Lockwood who is similar in age, education, and work experience could perform. [21.] Based on her lack of relevant work and the testimony of the VE, the ALJ found Lockwood was not disabled before August 1, 2007. Lockwood's claim was partially denied at step five because she could have made a successful adjustment to other work which existed in the national economy from December 12, 2004 to July 31, 2007. [24.]

After determining Lockwood was not disabled prior to August 1, 2007, the ALJ considered whether Lockwood's impairments fit Appendix 1, beginning on or around August 1, 2007. 20 C.F.R. Pt. 404, Subpt. P., Appx. 1. The ALJ determined that as of August 1, 2007, Lockwood's mental impairments met the criteria of Listing 12.03: Schizophrenic, Paranoid and

Other Psychotic Disorders. [25]; 20 C.F.R. Pt. 404 Subpt. P., Appx 1 § 12.03. Because her mental impairment fit a listing in Appendix 1 of the relevant regulations, the ALJ determined Lockwood was disabled as of August 1, 2007.

## A. *Substantial evidence supports a finding of disability beginning on or around August 1, 2007.*

The Commissioner's finding of an onset of disability on August 1, 2007, does not contradict the bulk of the evidence.

What stands out the most when reviewing the record is the sharp change in Lockwood's medical records beginning around August 1, 2007. Lockwood started seeing Dr. Majeroni in 2005. Prior to August 1, 2007, there had been little evidence of psychological problems. Lockwood was being treated for depression and anxiety. [436.] The records also indicate that Lockwood had difficulty sleeping. [348, 351.] In Lockwood's medical records, her doctors had described her affect as bright with no indication of impaired judgment. [331, 333, 351-52.] Lockwood did have an outburst at ECMC on April 28, 2005, but she was not demonstrating any signs or symptoms of Paranoid Schizophrenia. [308.] The transcript from the hearing on May 18, 2007, indicated that Lockwood suffered from some confusion, but still had a decent perception of reality. [407-27.] In fact, Lockwood was not diagnosed with Paranoid Schizophrenia until September 13, 2007. [379.]

In contrast, Lockwood's behavior was markedly different after August 1, 2007. That day, Lockwood was fired from Goodwill after responding to her hallucinations in a verbal outburst. [360.] Records subsequent to August 1, 2007 describe Lockwood as having impaired insight and judgment, and seeming depressed or suspicious. [360, 332, 337.] Just a few days later,

Lockwood had begun to complain her medication had been stolen out of her home, and began openly talking about the hallucinations that she called "hybrids." [360.] Lockwood later mentioned she believed her boss was demanding sexual favors and she was asked to sleep with three men for $20,000. [358.] The time after August 1, 2007 also included statements from Lockwood claiming her food was being poisoned and statements of a girl's uterus being torn out of her body. *Id.* Lockwood also stated that, at this time, she had an unspecified connection with the people who killed John F. Kennedy and Martin Luther King Jr. *Id.* Lockwood's statements to her physicians seemed dark and disconnected. Compared to the May 18, 2007 hearing, the transcript of Lockwood's October 15, 2009 hearing reveals a much greater assertiveness about her hallucinations and how she believed her alternate reality to be true. [430-49.] Together, the information available on the record after August 1, 2007 casts Lockwood as a woman suddenly and significantly detached from reality, in ways that do not appear in the records before that time.

Once Lockwood displayed the signs and symptoms of Paranoid Schizophrenia, her impairment met Listing 12.03 pursuant to Appendix 1. 20 C.F.R. Pt. 404, Subpt. P., Appx. 1, §12.03. Even though Lockwood was showing signs of confusion, or psychological problems prior to August 1, 2007, the records undeniably indicate the manifestation of Paranoid Schizophrenia subsequent to that date. Therefore there is substantial evidence to support a finding of disability on or around August 1, 2007.

## B.  There is no evidence to support the alleged onset date of August 20, 2003.

As discussed above, substantial evidence supports a finding of disability after August 1, 2007. The Court assessed the available evidence to establish the significance of the August 1,

2007 date, but the parties do not dispute a finding of disability after that date. The real dispute in this case is whether Lockwood had a disability existing before August 1, 2007. Specifically, the parties dispute whether Lockwood had a disability reaching as far back as her alleged onset date of August 20, 2003. Psychiatric tests were never performed prior to August 1, 2007, because the impairments Lockwood had previously alleged were purely physical and not disabling. *See Anderson v. Bowen*, 868 F.2d 921, 928 (7th Cir. 1989). Resolving the parties' dispute requires reviewing how the ALJ assessed non-medical testimony as well as medical testimony. The Court must review Lockwood's refusal of medical care and how the ALJ treated that refusal under SSI 82-59. As the Court will explain below, substantial evidence supports how the ALJ addressed each one of these issues.

### 1. Non-medical testimony was properly assessed by the ALJ.

In an attempt to establish an earlier onset date, Lockwood argues that she can establish that these symptoms of Paranoid Schizophrenia have existed since at least 2003, by her own testimony and the testimony of her children. [354.] Lockwood consequently argues that the ALJ did not give her testimony and her son's testimony enough weight (Dkt. No. 10 at 16). The Commissioner responds that the ALJ properly discounted the lay testimony from Lockwood and her son because nothing in the record supported it. Dkt. No. 11 at 5; [401-02].

When assessing evidence of a claim, "the ALJ must also consider and weigh all of the non-medical evidence before him." *Burnett v. Comm. of Soc. Sec. Admin.*, 220 F. 3d 112, 122 (3d Cir. 2000). A claimant cannot be found disabled based on her symptoms if there is no evidence to show the impairment was so severe it was disabling. *Kendall v. Apfel*, 15 F. Supp. 2d 262, 267 (E.D.N.Y. 1998). A claimants' testimony is given great weight *only* if it is supported by

objective medical evidence. *See* SSR 96-7p (emphasis added). Great weight is given to a lay witness' testimony *only* if it is un-contradicted by the record. SSR 96-7p; *Eskridge v. Astrue*, 569 F. Supp. 2d 424, 439-40 (D. Del. 2008) (emphasis added). "As a fact-finder, an ALJ is free to accept or reject testimony." *Williams Ex Rel. Williams v. Bowen*, 859 F.2d 255, 260 (2d Cir. 1988). "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). If the evidence relied on by a claimant is unsupported by clinical findings in the record, the ALJ is not obligated to discuss it in his decision. *Anderson*, 868 F.2d at 924. The testimony by non-medical sources must be consistent with medical evidence. *See Williams Ex Rel. Williams*, 859 F.2d at 261. The ALJ has the discretion to evaluate a claimants' credibility. *See Serra v. Sullivan*, 762 F. Supp. 1030, 1034 (W.D.N.Y. 1991). The "credibility determination by the ALJ must stand unless patently wrong in view of the cold record." *Anderson*, 868 F.2d at 927 (internal quotation marks and citation omitted). When considering a claimant's testimony, the ALJ will factor in daily activities as well as the extent and duration of her symptoms as well as the treatment provided. 20 C.F.R. § 404.1529(c)(3).

Here, Lockwood did not identify, and the ALJ did not find, any evidence in the record which would indicate a psychological impairment at the time of, or prior to, the hearing on May 18, 2007. *See Anderson*, 868 F.2d at 928. Lockwood never reported seeing or hearing "hybrids" to any medical source. Lockwood's son claims he can testify that Lockwood suffered from hallucinations earlier than August 1, 2007; however, he cannot provide a specific date when these episodes occurred. [440.] Lockwood's son's testimony is not supported by substantial evidence.

There are many discrepancies between Lockwood's statements and the record. [407-27.] Lockwood claimed severe impairments and severe restrictions in her activities of daily living. [287.] In more than one place in the record, however, Lockwood was taking part in regular daily activities. [407-27, 430-49.] Because of the inconsistencies in Lockwood's statements, the medical examiner discredited Lockwood's credibility. [287.]; *see Aponte v. Sec'y, Dep't of Health & Human Services*, 728 F.2d 588, 591-92 (2d Cir. 1984) (the claimant's complaints of disabling pain was discredited because he was still performing regular daily activity). When iconic episodes are not serious enough to be reported to a physician, any impairment in issue can be considered not serious enough to impair the ability of work. *See Mongeur v. Heckler*, 722 F.2d 1033, 1040 (2d Cir. 1983) (where a claimant's fainting spells were not serious enough to prevent him from taking part in substantial gainful activity because neither he nor his wife found his condition serious enough to report to a physician). Without medical evidence to support her claims, there is no way to determine Lockwood suffered from symptoms of Paranoid Schizophrenia before August 1, 2007. *See Anderson*, 868 F. 2d at 926.

Under these circumstances, the ALJ reasonably found that Lockwood's own statements and actions contradict her claim, and the record also contradicted Lockwood's testimony. Substantial evidence supports the finding that Lockwood's testimony was not credible.

### 2. Medical Testimony was properly considered and weighed by the ALJ.

With respect to medical testimony, Lockwood argues that Dr. Majeroni's opinion about her disability should be given controlling weight due to the fact that she was Lockwood's treating physician for "several years" (Dkt. No. 15 at 5). The Commissioner responds that the ALJ properly weighed and discounted Dr. Majeroni's opinion as subjective and gave proper

weight to Dr. Jaffri since the two physicians had similar relationships with Lockwood at the time of the consultative exam. [22-24, 288]; *see* 20 C.F.R. § 416.927(c).

A treating physician's opinion is given "controlling weight" when it is "well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the record. 20 C.F.R. § 1527(d)(2); *see Poupore v. Astrue*, 563 F.3d 15, 19 (2d Cir. 2009) (where the treating physician's testimony was not entitled to controlling weight because it was unsupported by objective medical evidence). The ALJ has discretion in weighing medical evidence and can disregard contradicting medical opinions. *See Amax Coal. Co. v. Beasley*, 957 F.2d 324, 327 (7th Cir. 1992). The duty to assess the claimant's RFC rests solely with the ALJ, not the treating doctors. 20 C.F.R. § 416.946.

To evaluate the opinion of a treating physician, the Commissioner must consider six factors under 20 C.F.R. § 416.927(c). The factors to be considered include: the examining relationship, treatment relationship, supportability, consistency, specialization and other factors brought to the ALJ's attention. 20 C.F.R. § 416.927(c). When a treating physician's opinion is given less weight, controlling weight is awarded to the consultative physician. *See Veino v. Barnhart*, 312 F.3d 578, 583-84 (2d Cir. 2002). It is well established in the Second Circuit that a consultative examining physician's opinion may constitute substantial evidence to support the findings of an ALJ. *Diaz v. Shalala,* 59 F.3d 307, 315 (2d Cir. 1995); *see Mongeur*, 722 F.2d at 1039. The ALJ need not explicitly "reconcile every conflicting shred of medical testimony." *Miles v. Harris*, 645 F.2d 122, 124 (2d Cir. 1981).

Here, the record shows a difference between Dr. Majeroni's reliance on self-reporting and Dr. Jaffri's clinical examination. There is nothing in Dr. Majeroni's exam report other than

16

Lockwood's complaints that would indicate Lockwood had significant limitations. [22, 23, 435.] At her hearing, Lockwood herself testified that she "knew" that she had certain limitations because Dr. Majeroni said so, but that Dr. Majeroni performed no imaging tests. [435.] In contrast, Dr. Jaffri took an x-ray of Lockwood's lumbar spine to discover the cause of her pain on February 18, 2005. [240.] From this objective imaging information, Dr. Jaffri opined that Lockwood had mild to moderate physical exertional limitations. [22, 288.] Dr. Jaffri's assessment is supported by the State Analyst Medical Examiner, who opined that Lockwood could perform activities consistent with full range of light work. [284-89.] Dr. Jaffri is an expert in evaluating the medical issues of disability and therefore his opinion constitutes substantial evidence. *See McEaney v. Comm'r of Soc. Sec.*, 536 F. Supp. 2d 252, 256 (N.D.N.Y. 2008).

Under these circumstances, objective clinical information in the record gives more weight to Dr. Jaffri's assessment that Lockwood could perform light sedentary work, as opposed to Dr. Majeroni's assessment of sedentary work only. The ALJ therefore, did not commit any legal error and did not fail to follow the appropriate legal standards contained in the Social Security Rulings when giving limited weight to Dr. Majeroni's testimony.

## 3. The ALJ properly found that Plaintiff refused reasonable medical care under SSR 82-59.

Next, Lockwood argues that the ALJ ignored her reasons why she declined to undergo a hysterectomy. As mentioned above, Lockwood had discussed a hysterectomy with her doctors and had gone as far as scheduling one. [308.] At both hearings, Lockwood alleged she did not deny treatment but never received medical approval for a hysterectomy. [413-14, 433.] Lockwood also claims that she did not undergo surgery for religious reasons (Dkt. No. 10 at 20).

The Commissioner responds that Lockwood was approved for the surgery and that she gave no reasons for refusal when the surgery was scheduled. [308]; (Dkt. No. 11 at 7).

A remedial impairment does meet a level of disability. *Dumas*, 712 F.2d at 1553. If a prescribed treatment could restore a claimant's ability to work, the claimant must undergo said treatment to be disabled, unless there is a justifiable cause for failure to do so. SSR 82-59. An example of a justifiable reason includes: religion, intense fear of surgery, unusually high risk because of unusual nature, or if a medical source advises against it. 20 C.F.R. § 404.1530. If there is no acceptable reason for refusal of treatment, the claimant will be disqualified from receiving benefits. *Id.* One exception to the general principle under SSR 82-59 concerns mental illness. "Someone who is truly paranoid or who is hallucinating . . . is unlikely to accept treatment prescribed by doctors . . . because he is not acting under a 'reasonable fear[.]'" *Benedict v. Heckler*, 593 F. Supp. 755, 761 (E.D.N.Y. 1984) (a reasonable standard is not applicable to those who are not reasonable) (*quoting, Rivera v. Schweiker*, 560 F. Supp. 1091, 1095 (S.D.N.Y. 1982)).

Here, the record justifies discounting Lockwood's claimed reasons for refusing reasonable medical care that would correct her problem. Lockwood's claims pertaining to religious reasons are found nowhere in the record. Lockwood, in fact, was approved for surgery and gave no reason for changing her mind during her "outburst" at ECMC on April 28, 2005. [308.] The principle regarding mental illness that *Benedict* explains is not applicable in the instant case. Nothing in the record establishes that when Lockwood was contemplating surgery in 2005, she was suffering from Paranoid Schizophrenia. Around the time Lockwood was considering a hysterectomy, her fibroid symptoms were being treated with Depo-Provera shots and gradually began to lessen with menopause. [236, 294, 339.] Medical findings also offer some

evidence that Lockwood's fibroids could have been fully treated with a hysterectomy. [22, 236.] In this context, the ALJ reasonably considered Lockwood's fibroids remedial and therefore not a disability. *See Dumas*, 712 F.2d at 1553.

Because there is no evidence Lockwood suffered from a psychological impairment before August 1, 2007, and because her physical impairment had never risen to a level of disability, there is no substantial evidence to support Lockwood's alleged onset date of August 20, 2003.

## C. Substantial evidence and regulations support the finding of August 1, 2007, as a reasonable onset date.

The Social Security Rules and regulations, combined with the substantial evidence in the record, support the finding of August 1, 2007, as a reasonable onset date. In addition to determining that an individual is disabled, the Commissioner must also establish the onset date of disability. SSR 83-20. The ruling provides that an alleged onset date should be used when it is consistent with all the evidence. SSR 83-20. The onset date is not the exact time of disability, but the date when it is most reasonable to conclude, from a legitimate medical basis, that the impairment suffered was sufficiently severe to prevent the individual from partaking in substantial gainful activity. SSR 83-20. The ALJ can infer an onset date of the day most reasonable to conclude disability, if it is supported by medical evidence. SSR 83-20; *see Newman v. UNUM Life Ins. Co. of Am.*, 2000 WL 1593443, *4 (N.D. Ill. Oct. 23, 2000). If substantial evidence points to a basis for conclusion, the ALJ decision will be upheld. *Berry*, 675 F.2d at 468 (2d Cir. 1982); *see Perez v Charter*, 77 F.3d 41, 46 (2d Cir. 1998).

Here, as the Court has discussed earlier, substantial evidence indicates that the time around August 1, 2007 was a time of significant change in Lockwood's medical history. Prior to

this time, Lockwood presented her treating physician with the physical condition of her fibroids and the mental condition of her depression and anxiety. [43.] In the record, August 1, 2007 was the first time when Lockwood's schizophrenia, hallucinations and delusions appeared. [445.] As discussed above, Lockwood's fibroids were a remedial impairment that were addressed by Depo-Provera shots, lessened with menopause, and potentially eliminated with surgery. The record drastically changes after August 1, 2007, as Lockwood became much more expressive about her hallucinations and increasingly bizarre beliefs. [360, 436.]

To the extent Lockwood argues that schizophrenia rarely debuts in someone after age 50, she has a limited point, that it cannot be determined exactly when her schizophrenia developed (Dkt. No. 15 at 3). A disease like Paranoid Schizophrenia might build on other symptoms, such as depression and anxiety, before manifesting itself. Nonetheless, Lockwood's pre-2007 records show no signs of hallucinations and delusions while her post-2007 records do so dramatically. Regardless of when a formal diagnosis might have been possible for the first time, there is a manifestation of schizophrenia so distinct that the date August 1, 2007, stands out in the record. The ALJ can infer August 1, 2007, as a reasonable date pursuant to SSR 83-20. For these reasons, substantial evidence supports the ALJ's choice of August 1, 2007 as an onset date.

## V.    CONCLUSION

For the foregoing reasons, this Court respectfully recommends granting the Commissioner's Motion for Judgment on the Pleadings (Dkt. No. 9). The Court further recommends denying Lockwood's Cross-Motion (Dkt. No. 15).

## VI.   OBJECTIONS

A copy of this Report and Recommendation will be sent to counsel for the parties by electronic filing on the date below. Any objections to this Report and Recommendation must be electronically filed with the clerk of the Court within 14 days. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72. "As a rule, a party's failure to object to any purported error or omission in a magistrate judge's report waives further judicial review of the point." *Cephas v. Nash*, 328 F.3d 98, 107 (2d Cir. 2003) (citations omitted).

SO ORDERED.

___/s Hugh B. Scott_____
HONORABLE HUGH B. SCOTT
UNITED STATES MAGISTRATE JUDGE

DATED: August 8, 2014